UNITED STATED DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO. 5:09CV-31-R

CLAUDIUS V. WILLIAMS,
Administratrix of the estate of
Clifford L. Warfield, Jr., deceased                                         PLAINTIFF

v.

TOM SIMPSON, *et al.*                                                       DEFENDANTS

**MEMORANDUM OPINION AND ORDER**

Defendants Steve Hiland and Chanin Hiland have filed a Motion for Summary Judgment (DN 93). Plaintiff, Claudius V. Williams, has filed a response (DN 98). Defendants have filed a reply (DN 121). Defendants Tom Simpson and Rick Pershing have filed a Motion for Summary Judgment (DN 89). Plaintiff has filed a response (DN 101). Defendants have filed a reply (DN 107). Defendants John Wood and Jim Royster have filed a Motion for Summary Judgment. (DN 91). Plaintiff has filed a response (DN 99). Defendants have filed a reply (DN 111). Accordingly, these matters are now ripe for adjudication.

**BACKGROUND**

On a Motion for Summary Judgment, the facts must be viewed in the light most favorable to the non-moving party. The Background will include facts most favorable to the non-moving party.

This case arises from the death of an inmate housed at the Kentucky State Penitentiary ("KSP"). Clifford L. Warfield, Jr. ("Warfield") was involved in criminal activity that resulted in a 35 year prison sentence. DN 93, Exhibit 3. Prior to his prison sentence, Warfield had been shot in the stomach, increasing the likelihood of developing a bowel obstruction. DN 93, exhibit 4, pg. 3 Defendants Steve Hiland and Chanin Hiland, medical professionals responsible for the care of

Warfield, were aware of the increased risk of bowel obstruction. *Id.* In fact, it was noted in Warfield's file to be alert for potential bowel obstructions when giving Warfield care. *Id.*

On August 4, 2008, Warfield began vomiting and experiencing sharp pain in his abdomen. *Id.* These are classic signs of a bowel obstruction. *Id.* at 7. A nurse responded to the call for help and noted that Warfield's abdomen was swollen and firm and that his bowel sounds were hypoactive. *Id.* at 3. Despite this, when the nurse called Dr. Steve Hiland ("Dr. Hiland"), he instructed the nurse not to move Warfield to the infirmary. *Id.* As Warfield continued to experience pain, the other inmates got restless about his treatment. Accordingly, a guard called the prison warden, Tom Simpson ("Simpson"), and asked for permission to transfer Warfield. DN 104, Exhibit 5. At that point, permission was given by both Warden Simpson and Dr. Hiland to transfer Warfield to the infirmary. *Id.*

In the infirmary, Warfield displayed a number of symptoms. Between the morning of August 4th when he was first admitted and the morning of August 5th when he was discharged, Warfield had, at one point or another, abdominal pain, decreased bowel sounds, vomiting, fever, high blood pressure, increased respiratory rate, constipation, inability to eat or drink and high glucose and ketones readings. DN 93, exhibit 4, pg. 3-4. Dr. Hiland performed a blood test, a urinalysis, and an x-ray. *Id.* at 4. The results of all these tests came back inconclusive. Advanced Registered Nurse Practitioner Chanin Hiland ("Nurse Hiland") performed an exam of the patient, although her conclusions are unclear. *Id.* Dr. Hiland also performed his own brief exam of the patient, and found normal bowel sounds. *Id.* Despite all the symptoms presented by Warfield, Dr. Hiland diagnosed

2

him as "malingering,"[1] without commenting on the various symptoms that would be impossible to fake, and discharged Warfield after a day. *Id.*

After discharge, Warfield was sent to a segregation cell where he was housed separately from the general inmate population. On the way to the segregation unit, Warfield vomited again and the officers escorting him had to help him stay on his feet due to his 'obvious pain.' DN 104-22. Lt. Shaw, an officer in the segregation unit, contacted Defendant John Wood, Nursing Services Administrator at KSP ("Wood"), about Warfield and Lt. Shaw was told to keep an eye on Warfield. *Id.* Lt. Shaw then contacted Defendant Deputy Warden Rick Pershing ("Pershing") and was told to place Warfield in an observation cell. *Id.* Accordingly, Warfield was placed in an observation cell directly in front of the officer's station. *Id.* Warfield continued to vomit through the night of the 5th and began showing a new symptom - bloody urine. *Id.* Lt. Shaw once again phoned Wood. *Id.* Wood stated that he thought the inmate was actually sick but the doctor had decided he was faking. *Id.* There is some evidence that the continued and new symptoms were reported to the medical staff, including Dr. Hiland and Nurse Hiland.

Warfield continued to be seen by nurses about once a day for the next couple of days. The nurses noted his continued symptoms and reported them to Dr. Hiland and Nurse Hiland. DN 104-34. Despite all of this, there was no additional treatment. On August 8th, Nurse Jim Royster ("Royster") examined Warfield, and believing something serious was wrong, took his concerns to Dr. Hiland. DN 104-37. After discussing the various symptoms, Dr. Hiland was able to convince Nurse Royster that Warfield was not showing any serious symptoms. Because Warfield continued

---

[1]Malingering is "the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives[.]" *DSM-IV-TR*.

to experience severe pain, among other symptoms, Wood visited the patient to perform his own exam. DN 104-38. Upon completing the exam, Wood also felt that the patient was experiencing real and severe symptoms. *Id.* Accordingly, Wood went to Simpson to discuss the situation. After Wood explained to Simpson the results of his exam, Simpson telephoned Dr. Hiland at home. After some discussion, Dr. Hiland approved a transfer of Warfield back to the infirmary. *Id.* That evening, in the infirmary, Warfield vomited again and the staff noticed that the emesis smelled like fecal matter. DN 93, exhibit 4, pg. 5. Upon hearing this via telephone, Dr. Hiland immediate ordered Warfield transported to a hospital. *Id.*

Upon arrival at Western Baptist Hospital, emergency surgery was performed. *Id.* During the surgery, the surgeon found that Warfield had "extensive necrosis, infection and gangrene with multiple holes and loops in his small and large intestine, and no viable small bowel[.]" *Id.* Warfield's situation was terminal, and he was given end of life care. *Id.* On August 12th, Warfield died as a result of the bowel obstruction. *Id.*

## STANDARD

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party

4

bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

Finally, while Kentucky state law is applicable to some portions of this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

This Court will first consider the § 1983 claims with respect to the various Defendants. After, this Court will consider the state law claims with respect to the various Defendants.

### § 1983 Claim - Deliberate Indifference (8th and 14th Amendments)

**A. Steve Hiland and Chanin Hiland**

The first argument made by Dr. Hiland and Nurse Hiland is that they are only named in their official capacity and are thus entitled to immunity under the 11th amendment. The second argument made by Dr. Hiland and Nurse Hiland is that they are entitled to qualified immunity for the § 1983

claim because they did not violate a constitutional right.

**I. Capacity**

Defendants Steve Hiland and Chanin Hiland state that they are only sued in their official capacity, and therefore are immune from a § 1983 claim under the Eleventh Amendment. Looking to the caption of the complaint, nothing indicates that the Defendants were named in their official capacity. Rather, their names are followed by their professional titles, M.D. and ARNP, and their work addresses. Under the parties section of the complaint, it clearly states that Steve Hiland and Chanin Hiland "personally participated in the mistreatment of Mr. Warfield." This language should have put Defendants on notice that they were being sued in their individual capacities. In the 'Nature of Defendants' Conduct' section of the complaint, Paragraph 11 starts by stating "Defendants, **individually** and in conspiracy with one another . . . . the **individual** Defendants . . . ." While the Defendants contend that these two lone references cannot alone show proper naming of Defendants in their individual capacity, this Court disagrees. Unlike in *Shepard v. Wellman*, 313 F.3d 963 (6th Cir. 2002), there is nothing in the complaint to "strongly suggest[] an official capacity suit." *Id.* at 969. Rather, the complaint has largely neutral language, so the various references to Defendants' 'personal participation' and 'individual actions' is more than sufficient to give Defendants proper notice. Finally, Plaintiff requested compensatory and punitive damages. Because this can only be asserted against Defendants in their individual capacities, it also placed Defendants on notice. *Moore v. City of Harriman*, 272 F.3d 769, 773 (6th Cir. 2001). Looking at only the complaint, rather than the entire "course of proceedings" as required by the Sixth Circuit, it is clear that Defendants are named in their individual capacity. *Id.*

Finally, Defendants argue that, as they were only served in their official capacity, this should

be dispositive on the manner in which they were named. However, the precedents Defendants rely on go only to jurisdiction, not capacity. If Defendant planned to take issue with service, the appropriate time to do so has long since passed. *McDonald v. Mabee*, 243 U.S. 90, 91 (1917) ("jurisdiction by appearance may take the place of service upon the person"). Defendants claim they have only "defended themselves . . . in their official capacities." However, nothing in their answer limited their appearance or suggested a defect in personal jurisdiction. Accordingly, Defendants are currently before this Court in their individual capacity.

**II. Deliberate Indifference**

The Supreme Court mandates "a two-step sequence for resolving government officials' qualified immunity claims." *Pearson v. Callahan*, 123 S.Ct. 808, 815 (2009).

> "First, a court must decide whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right . . . [s]econd, if the plaintiff has satisfied the first step, the court must decide whether the right at issue was "clearly established" at the time of defendant's alleged misconduct."

*Id.* at 815-16. While a court was originally mandated to evaluate the steps in numerical order, the Supreme Court recently stated that "the judges of district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of qualified immunity analysis should be addressed first[.]" *Id.* at 818. In the instant case, Plaintiff has alleged constitutional violations as a result of deliberate indifference to medical needs.

As its jurisprudence has evolved, the Supreme Court has stated that the Eighth Amendment encompasses "the evolving standards of decency that mark the progress of a maturing society" and "the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotations omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Id.* Failure to provide

7

medical care could produce pain and suffering, physical torture or a lingering death "inconsistent with contemporary standards of decency[.]" *Id.* Accordingly, the "deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Id.* at 104. "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.* at 104-05.

However, an "inadvertent failure to provide adequate medical care" or a "negligent [diagnoses or treatment]" does not state a valid claim of medical mistreatment under the Eighth Amendment. *Id.* at 104-05. Similarly, a dispute over the adequacy of treatment also does not generally result in a constitutional violation. *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976). Rather, an inmate must be "exposed to undo suffering or the threat of tangible residual injury." *Id.*

The difference between negligence and deliberate indifference is discussed in *LeMarbe v. Wisneski*, 266 F.3d 429 (6th Cir. 2001). A plaintiff must show that an official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 436 (citing *Farmer v. Brennan*, 511 US 825, 837 (1994)). "An official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* A plaintiff can also establish deliberate indifference "by a showing of grossly inadequate care as well as a decision to take an easier but less efficacious course of treatment [or] . . . when the need for treatment is obvious [and] medical care . . . is so cursory as to amount to no treatment at all." *Terrance v. Northville Reg'l Psychiatric Hosp.*, 286 F.3d 834, 843-44 (6th Cir. 2002) (citing 11th

8

and 4th Cir. precedent).

Similar to *LaMarbe*, there are a number of facts that both Dr. Hiland and Nurse Hiland were aware of that easily establish the inference of a substantial risk of serious harm. Both Dr. Hiland and Nurse Hiland were aware that (1) Warfield had been shot in the stomach, and as a result had damage to his bowel; (2) the gun shot and bowel damage increased the likelihood of bowel complications for the rest of Warfield's life; (3) Warfield had actually experienced bowel difficulties as a result of the gun shot and damage; (4) the symptoms experienced by Warfield on August 4th were consistent with life-threatening bowel problems; and (5) bowel problems not treated quickly can result in death. Taken in total, "Physician and ARNP were well aware of possibility of bowel obstruction." Collatt Report, DN 97-41, pg. 4. Taking all the facts in the light most favorable to the plaintiff, it is clear that Dr. Hiland and Nurse Hiland were aware of facts that easily led to the inference of a substantial risk of serious harm.

Whether Dr. Hiland and Nurse Hiland actually drew the inference is a much more difficult question. In *LaMarbe*, testimony of an expert that "anyone with a medical education" would have drawn the inference was enough to show that the inference was drawn, satisfying the subjective requirement. *Id.* at 438. The court went on to explain that "a prisoner is not required to show that he was literally ignored by the staff to prove an Eighth Amendment violation, only that his serious medical needs were consciously disregarded." *Id.* This standard has been further clarified - a court must ask "whether a reasonable doctor in his position could have concluded that a substantial risk of serious harm to [Warfield] existed." *Phillips v. Roane County, Tenn.*, 534 F.3d 531, 544 (6th Cir. 2008); *Terrance*, 286 F.3d at 844, 845, 846. In *Phillips*, a doctor who was aware of multiple risk factors and gave only a cursory exam was found to have disregarded a serious medical need. In

9

*Kosloski v. Dunlap*, 347 Fed. Appx. 177 (6th Cir. 2009), the court found that the subjective requirement was not met when an inmate, after experiencing some symptoms, identified a disease to a nurse that he was at risk for. *Id.* at 179. Upon determining that the inmate exhibited no symptoms consistent with the disease he claimed to have, the nurse sent him back to his cell after a two minute exam. *Id.* As it turned out, the inmate was suffering from the disease he identified, and sustained an injury due to the delayed treatment. *Id.*

While a close call, taking the facts in the light most favorable to the non-moving party, this case follows *Terrance*, *LeMarbe* and *Phillips* more closely than *Kosloski*. Unlike *Kosloski*, Warfield was exhibiting known symptoms of a condition for which he was at risk for. "With Mr. Warfield's history of [gun shot wound], abdominal surgery, the sign and symptoms present by him starting on 8/04/08[,] the first consideration of the nurses should have been that of the possibility of bowel obstruction or at least signs and symptoms consistent with a bowel obstruction which merits immediate medical attention." Collatt Report, DN 97-41, pg. 5. While the exam in this case clearly lasted longer than the exam in *Kosloski* or *Phillips*, *LeMarbe* establishes that deliberate indifference can be present even if there is a surgery and multiple follow-up appointments. Similarly, *Terrance* establishes that deliberate indifference can be present if a patient regularly sees a health care professional, as long as a jury could possibly decide "that a reasonable doctor . . . would have concluded that a substantial risk of serious harm to the decedent existed." *Terrance* 286 F.3d at 845, 846. Also similar to *LeMarbe* and *Terrance*, Plaintiff's experts have testified that the first consideration of the medical officers should have been a bowel obstruction or something similar. Accordingly, a reasonable doctor or ARNP in Dr. Hiland's and Nurse Hiland's position could have concluded that a substantial risk of serious harm existed, as required by *Phillips*.

Even without relying on the 'reasonable doctor' standard, the Sixth Circuit has established that the subjective requirement of indifference can be met if the symptoms are so bad that a lay person would recognize the serious medical need. *LaMarbe*, 266 F.3d at 438. Plaintiff has presented evidence that multiple lay employees at the prison thought that there was a serious medical need and this is strong circumstantial evidence of deliberate indifference by trained physicians. Additionally, as discussed above, the Sixth Circuit approved of language from other circuits stating that deliberate indifference is present "when the need for treatment is obvious [and] medical care . . . is so cursory as to amount to no treatment at all[.]" *Terrance*, 286 F.3d at 843-44. In this case, Warfield had a cursory exam, was diagnosed as 'malingering,' and was then ignored for days as his symptoms persisted. Taking the facts in the light most favorable to Plaintiff, this is care so cursory as to amount to no treatment at all.

Finally, it is clearly established that access to care for a serious medical need is a constitutional right. *See, e.g.*, *id.* Neither side has disputed that, if a constitutional violation is present, that violation would be clearly established.

Per the reasoning above, Summary Judgement for Steve Hiland and Chanin Hiland is DENIED in regards to Plaintiff's § 1983 claims against them.

**B. Jim Royster and John Wood**

The standard for deliberate indifference discussed above also applies to Defendants Royster and Wood. Taking the facts in the light most favorable to Plaintiff, both nurses were familiar with Warfield's file. Accordingly, both knew that Warfield was at an increased risk for bowel obstruction. This means that, following the same reasoning above, both nurses were objectively aware of the serious need for medical attention, fulfilling the first requirement of deliberate

indifference.

The subjective component is complicated by the fact that, as nurses, both Wood and Royster must follow a doctor's orders and cannot operate independently. After initially evaluating Warfield and then administering the orders of Dr. Hiland and Nurse Hiland, Wood and Royster were bound to take no further action regarding the patient. However, Plaintiff contends that, since both nurses disagreed with the diagnosis of Dr. Hiland and Nurse Hiland, and in fact were consistently presented with evidence that the diagnosis was wrong, they were deliberately indifferent by not seeking help for Warfield via some other means.

The Sixth Circuit has not considered whether following a doctor's orders shields a nurse from liability. In two well reasoned opinions, the Fifth and Seventh Circuits considered the issue and arrived at opposite conclusions. *Compare Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010) (Nurse not shielded from liability when, for six weeks after inmate's appointment with a doctor, nurse continued to rely on diagnosis despite continuation of symptoms. Even if nurse was consulting with doctor over that period without inmate having an official appointment, nurse was still not shielded.) *with Thayer v. Adams*, 364 Fed. Appx. 883 (5th Cir. 2010) (nurses with no authority to "prescribe drugs or embark on a different course of treatment" did not create a grievance of constitutional magnitude by ignoring certain medical requests.).

For Royster, the facts clearly align more closely to the Fifth Circuit opinion than the Seventh. Royster saw Warfield per doctor's orders on August 8th, and this was his first contact with Warfield. Upon completing his examination, Royster was subjectively aware of Warfield's serious medical need. However, Royster responded reasonably to this knowledge. While Royster had both an objective and subjective awareness of a serious medical need, by acting on that knowledge he was

12

clearly not deliberately indifferent. Rather, Royster took his concerns to Warfield's treating physician, Dr. Hiland. After discussing Warfield's symptoms and Royster's concerns, Dr. Hiland explained to Royster his basis for the 'malingering' diagnosis and Royster felt that the explanation was reasonable. Once Dr. Hiland allayed Royster's concerns, Royster no longer had the required subjective knowledge and was shielded by Dr. Hiland's diagnosis. Accordingly, Royster's failure to go up the chain of command or consult a different physician cannot be deliberate indifference and summary judgment is GRANTED.

For Wood, there was a point when he was both objectively and subjectively aware of Warfield's serious medical need but was taking no action in response to his awareness. Taking the facts in the light most favorable to Plaintiff, Wood demonstrated his subjective awareness of Warfield's serious medical needs during his conversation with Lt. Shaw by stating that he thought Warfield should be in the infirmary. Despite this objective and subjective recognition, Wood took no action to convince Dr. Hiland and Nurse Hiland to reconsider their decision or consult a supervisor or outside physician. Similar to the Seventh Circuit case, a jury could find deliberate indifference because Wood "always had the ability to contact . . . other supervisory personal to voice any concerns about Dr. [Hiland]'s treatment of [Warfield's] condition." *Berry*, 604 F.3d at 443. Accordingly, the "extent to which [Wood] relied on [Dr. Hiland's] medical judgment and the reasonableness of any such reliance require further exploration at trial[.]" *Id.* at 444.

While Defendant claims that summary judgment is not appropriate because Wood only had a supervisory role, there are facts that show otherwise. Wood directly received the report from Lt. Shaw, and his response indicated that he was, at a minimum, aware of the circumstances surrounding Warfield. In addition, Wood saw Warfield in passing when he was initially in the infirmary and then

13

again on August 8th. As a result, Plaintiff is asserting a claim against Wood not as a supervisor, but for Wood's own failure to act. Accordingly, summary judgment for Wood is DENIED.

**C. Thomas Simpson and Richard Pershing**

The next issue is whether any actions taken by Warden Simpson or Deputy Warden Pershing rise to the level of deliberate indifference. Neither Warden Simpson nor Deputy Warden Pershing were directly involved in Warfield's care. Any time Warden Simpson or Deputy Warden Pershing were specifically asked to make a decision involving the care of Warfield, they generally ensured that Warfield got the most desirable treatment. As a preliminary matter, this does not show the kind of deliberate indifference required by the Eighth Amendment.

Applying the standards set out above, it is also unlikely that either Warden Simpson or Deputy Warden Pershing were familiar with Warfield's increased risk for bowel obstructions. While the Sixth Circuit has held that abdominal pain and vomiting are enough to demonstrate to a lay person that medical care is required, there is no factual dispute that Warfield initially received care shortly after demonstrating symptoms. Because Warden Simpson and Deputy Warden Pershing did not have knowledge of the objective facts tending to demonstrate that, in this particular instance, those symptoms created a serious medical need not corrected by the medical staff, there was no reason for them to question the medical treatment provided by the medical staff. Accordingly, there is no objective or subjective knowledge of a substantial risk of serious harm. With neither prong met, there is no showing of deliberate indifference.

Additionally, some circuits have held that non-medical personal are entitled to defer to the judgment of health professionals so long as the official did not ignore specific requests from the inmate. *Berry v. Peterman*, 604 F.3d 435 (7th Cir. 2010); *Spurill v. Gillis*, 372 F.3d 218 (3d Cir.

14

2004) Given that both Warden Simpson and Deputy Warden Pershing consulted medical staff when requested and did not ignore complaints by Warfield, this Court thinks that they are entitled to rely on KSP's health professionals. Accordingly, this also demonstrates that there was no deliberate indifference for either Simpson or Pershing.

As discussed above, Summary Judgment is GRANTED for Thomas Simpson and Richard Pershing in regards to Plaintiff's § 1983 claims against them.

## State Law Claims

### A. Steve Hiland and Chanin Hiland

Plaintiff has conceded that the tort of outrage is no longer applicable to the current case. Accordingly, the Court does not need to address the issue.

Having addressed the issue of capacity in the previous section, the primary issue to be resolved for the state claims is whether Dr. Hiland and Nurse Hiland are entitled to qualified official immunity. Qualified official immunity attaches to "discretionary acts or functions, *i.e.*, those involving the exercise of discretion and judgment, or personal deliberation, decision and judgment . . . in good faith; and within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Plaintiff also suggests that deliberate indifference can negate good faith. Neither side seriously contests the scope of employment prong of qualified immunity; accordingly, immunity will turn on the nature of the act.

"An act is not necessarily "discretionary" just because the officer performing it has some discretion with respect to the means or method to be employed." *Id.* Rather, some acts involving discretion can also be a ministerial act, which is an act that "requires only obedience to the orders of others," or results from a duty that "is absolute, certain, and imperative, involving merely

execution of a specific act arising from fixed and designated facts." *Id.* As a result, acts are rarely either solely discretionary or ministerial, so the analysis "looks for the dominant nature of the act." *Haney v. Monsky*, 311 S.W.3d 235, 240 (Ky. 2010). "A proper analysis must always be carefully discerning, so as to not equate the act at issue with that of a closely related but differing act." *Id.*

Some acts within inmate health care are discretionary and some are ministerial, and these different acts must be "carefully discern[ed.]" Under Kentucky State Penitentiary Policy Number KSP 13-02-04, "Qualified health care personnel **shall** interview and evaluate the complaint of each inmate." Pg. 1. Upon receiving complaint of an emergency, the "medical staff member on duty **shall** determine the level of the emergency[.]" *Id.* at 3. Since the medical staff member on duty, in this case either Dr. Hiland or Nurse Hiland, is required by policy to make a determination as to the level of emergency, that determination is ministerial. Since Plaintiff in this case contests the determination of the level of the emergency rather than the diagnostic and treatment plan after the determination of the level of emergency, this is a ministerial function not protected by qualified immunity. *Accord Smith v. Frankin County*, 227 F. Supp. 2d 667 (E.D.Ky 2002); *Gould v. O'Bannon*, 770 S.W.2d 220 (Ky. 1989).

Since there is no qualified immunity and Defendants have not contested Plaintiff's showing of negligence for summary judgment purposes, there is a valid state law claim against Dr. Hiland and Nurse Hiland.

As a result, the motion for summary judgment is DENIED for the state claims other than outrage.

**B. Jim Royster and John Wood**

Plaintiff has conceded that the tort of outrage is no longer applicable to the current case.

Accordingly, the Court does not need to address the issue.

To the extent that Plaintiff may have stated a valid state law claim against Royster, those claims are DISMISSED WITHOUT PREJUDICE. Given the overall complexity of this case, the jury may have some difficulty distinguishing the standards and evidence against the various defendants. Also expecting a jury to keep track of which defendants have state and federal claims and which have just state claims remaining will be too complicated. To simplify the trial, this Court declines to exercise supplemental jurisdiction over Royster.

Defendant Wood states that there is no expert evidence of causation, as generally required in medical malpractice cases. *See Baylis v. Lourdes Hosp., Inc.*, 8002 S.W.2d 122, 124 (Ky. 1991). However, "as an exception to the general rule, expert testimony is not necessary where the common knowledge or experience of laymen is extensive enough to recognize or infer negligence from the facts." *Id.* at n. 3. In the current case, there is no expert testimony that any action by Wood could have prevented Warfield's death, and this could not be inferred. Accordingly, any claims by Plaintiff revolving around Warfield's death must be dismissed for a lack of causation.

Plaintiff, however, states that the only damages claimed are those from the additional pain and suffering endured by Warfield as a result of Wood not seeking outside help earlier. In other words, Plaintiff seems to concede that if Wood had sought outside help, Warfield still would have died, but he could have received pain medication and appropriate end of life care sooner. It is this additional pain that serves as the basis for the negligence claim against Wood.

Plaintiff has offered no expert testimony that Wood's failure to act caused additional pain and suffering. However, this seems to be the type of injury that a layman could infer, especially given the speed with which Warfield was treated after Wood did decide to discuss the situation with

17

Warden Simpson. Accordingly, the motion for summary judgment is DENIED as to the remainder of the state claims against Wood.

**C. Tom Simpson and Richard Pershing**

The first issue regarding Tom Simpson and Richard Pershing is whether they are entitled to qualified immunity. Plaintiff relies on *Smith v. Franklin County*, 227 F. Supp. 2d 667, to establish that "the administration of medical care is a ministerial function by employees, including doctors." *Id.* at 681 (citing *Gould v. O'Bannon*, 770 S.W.2d 220, 222 (Ky. 1989)). However, neither Simpson nor Pershing "administered" medical care. Rather, Simpson and Pershing supervised the care provided by the medical staff. Under Kentucky law, public officers are not responsible for the negligence of those employed by them if they have employed persons of suitable skill. *Yanero*, 65 S.W.3d at 528. In addition, the decision to act on a report is "among those involving the exercise of discretion and judgment" and the decision "not to take further action upon review of such a report remains a discretionary act[.]" *Id.* It is clear that Simpson and Pershing were not engaged in the 'ministerial' function of 'administering medical care,' but rather were supervising the administration of care by medical professionals. It is also clear that there is no issue of hiring employees of something other than suitable skill. Finally, since acting on a report is a discretionary function such that even non-action is protected, clearly the actions taken by Simpson and Pershing in this case are also protected. Accordingly, Defendants Simpson and Pershing are entitled to qualified immunity for state law claims against them and their motion for summary judgment is GRANTED.

## CONCLUSION

In regards to the Motions for Summary Judgement on the 42 U.S.C § 1983 claims:

(1) Motion by Defendants Steve Hiland and Chanin Hiland is DENIED;

(2) Motion by Defendants Jim Royster and John wood is GRANTED in part and DENIED in part;

(3) Motion by Defendants Tom Simpson and Richard Pershing is GRANTED.

In regards to the Motion for Summary Judgement on the various state claims asserted by the Plaintiff:

(1) Motion by Defendants Steve Hiland and Chanin Hiland is GRANTED in part and DENIED in part;

(2) Motion by Defendants Jim Royster and John Wood is GRANTED in part and DENIED in part;

(3) Motion by Defendants Tom Simpson and Richard Pershing is GRANTED.

A **telephonic conference** will occur on **JANUARY 7, 2011 at 11:30 a.m. central time**. The Court will place the call to the remaining parties.